UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN ESTLE, MARGARET AHLDERS, LANCE SALONIA, and CHERYL WITMER,

Plaintiffs,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

Defendant.

Docket No.:

## COMPLAINT

Plaintiffs Steven Estle, Margaret Ahlders, Lance Salonia, and Cheryl Witmer complain against International Business Machines Corporation (IBM) as follows:

### I. SUMMARY OF ACTION

1. In 1990, Congress amended the Age Discrimination in Employment Act of 1967 (ADEA) by passing the Older Workers Benefit Protection Act (OWBPA) to curtail the practice of large employers using their overwhelming economic leverage to coerce and manipulate older workers to waive their rights and claims under the ADEA before they understand what they are signing away.

2. The OWBPA attempts to rectify this unfair practice, in part, by mandating strict, minimum requirements for employers to obtain a valid waiver of "any right or claim" under the ADEA when workers are let go in a group layoff. Among other pre-requisites for valid waivers, the employer must provide critical information to help laid-off workers determine whether they

1

have been discriminated against as a group because of their age (the "OWBPA comparator information"). The OWBPA comparator information includes the criteria used to select employees for layoffs and the ages and job titles of everyone in their unit who was selected for layoff and everyone in their unit who was spared.

3. As the Supreme Court has explained, the OWBPA implements "a strict, unqualified statutory stricture on waivers" so that "[a]n employee 'may not waive' an ADEA claim unless the employer complies with the statute." *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427 (1998). To this end, "[t]he OWBPA sets up its own regime for assessing the effect of ADEA waivers, separate and apart from contract law . . . [and] creates a series of pre-requisites for knowing and voluntary waivers." *Id.*

4. Dating back to 2001, when seeking waivers as part of a group layoff, IBM provided the workers with the OWBPA comparator information. *See, e.g.*, *Syverson v. International Business Machines Corp.*, 461 F.3d 1147, 1149 (9th Cir. 2006) (amended January 3, 2007) (noting that in a 2001 group layoff IBM asked for a waiver and "issued each selected employee a lengthy document . . . which details the job titles, ages, and numbers of those employees selected and those not selected for termination from various IBM divisions").

5. In 2014, however, IBM embarked on a company-wide project to, as one presentation to its current Chief Financial Officer and Vice President of Human Resources put it, "correct [its] seniority mix." At the same time, it abruptly stopped providing the OWBPA comparator information to workers it laid off. Yet, it still required them to sign a waiver to receive any severance payment or benefits.

6. The waiver that IBM extracted from the workers it laid off after it stopped providing the OWBPA comparator information in 2014 was different from the one it had used

before 2014. For the first time, IBM did not require workers to waive all their federal age discrimination rights and claims. Instead, it demanded that laid-off workers waive their right under the ADEA to bring age discrimination claims *collectively* in any forum, including in arbitration.

7. IBM's waiver specifically prohibited workers from pursuing their claims collectively, even in arbitration. IBM sought to deprive its workers of the essential economies and advantages from pursing their ADEA claims together and instead to burden them with the limitations and costs of bringing individual actions challenging the same discriminatory practices in secret arbitrations separate from each other.

8. The OWBPA is precise in protecting employees from "waiving any right or claim" under the ADEA unless the employer meets the OWBPA's disclosure requirements. The text of the ADEA incorporates the statutorily defined "right" of aggrieved employees to start or join a collective action. IBM's new waiver, which asked employees to waive those collective action rights specifically incorporated in the ADEA without providing the OWBPA comparator information, is therefore invalid.

9. Each Plaintiff worked in a different division of IBM for many years, and each was over the age of 55 when IBM laid them off in May 2016. They were all provided the limited choice of either (a) executing a release waiving their right under the ADEA to bring a collective action in any forum without receiving the comparator information required by the OWBPA, or (b) being denied all severance benefits.

10. Despite the OWBPA's unequivocal stricture on waivers in group layoffs without providing the OWBPA comparator information, IBM did not give Plaintiffs any comparator information. IBM provided none of the information about the ages and titles of their co-workers

being laid off and those being retained even though the OWBPA mandates that information be provided as pre-requisite for workers to knowingly and voluntarily waive their right to pursue age discrimination claims collectively.

11. With misgivings, but facing the prospect of a difficult job search and economic hardship, each Plaintiff reluctantly signed the waiver. Having not been given the OWBPA comparator information before they signed the waivers, and having learned since their layoffs of compelling evidence that IBM engaged in systemic age discrimination by targeting older employers for group layoffs—the type of evidence that the OWBPA comparator information would have provided—Plaintiffs now file this action to be relieved of the waivers they executed and be permitted to pursue their age discrimination claims collectively in arbitration.

12. The Resource Action Separation Agreement each Plaintiff signed requires that they pursue their claims in arbitration. Therefore, Plaintiffs are also filing a complaint with IBM's arbitration coordinator to commence their claims collectively in JAMS arbitration.

## II. **PARTIES**

13. Plaintiff Steven Estle is a citizen of the United States and is a resident of Lafayette, Colorado. He worked for IBM for 34 years, until he was terminated in May 2016 at age 56.

14. Plaintiff Margaret Ahlders is a citizen of the United States and is a resident of Loveland, Colorado. She worked for IBM for 33 years, until she was terminated in May 2016 at age 56.

15. Plaintiff Lance Salonia is a citizen of the United States and is a resident of Washington, District of Columbia. He worked for IBM for 10 years, until he was terminated in May 2016 at age 56.

16. Plaintiff Cheryl Witmer is a citizen of the United States and is a resident of Firestone, Colorado. She worked for IBM for 34 years, until she was terminated in May 2016 at age 57.

17. As each Plaintiff was over 40 years old when they were laid off from their employment by IBM, each had the right under the ADEA to bring or join a collective age discrimination claim. Each Plaintiff also was covered by the OWBPA's guarantee that any waiver of those rights would not be valid or legally enforceable if they did not receive the OWBPA comparator information.

18. Defendant IBM is a New York corporation with its principal place of business in Armonk, New York. IBM provides technology services and equipment, including computing, cloud services, software, hardware, and analytics, to customers around the world. IBM employs about 400,000 employees and ranks number 34 on the 2018 Fortune 500 rankings of the largest United States corporations by total revenue.

### III. JURISDICTION AND VENUE

19. This Court has proper subject matter jurisdiction over Plaintiffs' claims for declaratory relief under 29 U.S.C. 626(b) (broad grant of jurisdiction over any action to enforce ADEA and OWBPA), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343 (civil rights) because this action seeks equitable relief, including declaratory and injunctive relief and arises under the ADEA and the OWBPA, 29 U.S.C. § 621, *et seq.*, and because Plaintiffs' "right to relief necessarily depends on the resolution of a substantial question of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S.1, 27-28 (1983); *see also Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998) (deciding enforceability of ADEA waiver as a matter of federal statutory law).

20. Each Plaintiff signed a Resource Action Separation Agreement, attached as Exhibit 1 (Attachments 6 and 7). Attachment 7 to each of their Agreements provides that "[a]ny issue concerning the validity or enforceability of any of the class action or collective action Waivers included as part of your agreement to arbitrate certain claims shall be decided only by a court of competent jurisdiction."

21. Based on this requirement in IBM's Resource Action Separation Agreement, Plaintiffs file this action in court because it challenges the validity and enforceability of the collective action waivers on the grounds that the waivers violate the OWBPA, 29 U.S.C. § 626(f).

22. Because Attachment 7 to the Agreements signed by Plaintiffs also provides that they "are required to submit any and all 'covered claims,' which include 'all legal claims . . . under the [ADEA],'" to final and binding arbitration, Plaintiffs are also filing an ADEA collective action in arbitration under the procedures set out in Attachment 7.

23. Under Rule 1(a) of the JAMS Class Action Procedures, Plaintiffs expect proceedings on that complaint to be stayed until this Court issues a ruling on the validity of the collective action waiver.

24. If the Court decides that the collective action waiver is invalid, Plaintiffs are prepared and willing to proceed collectively in arbitration.

25. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 because IBM has its headquarters in Armonk, Westchester County, New York.

26. Additionally, the White Plains courthouse is proper under Rule 18 of the Rules for the Division of Business of the U.S. District Court for the Southern District of New York because, upon information and belief, the policies and practices giving rise to the claims in this

action were developed by senior IBM personnel operating out of the company's headquarters in Armonk, Westchester County, New York.

## IV. ALLEGATIONS

**The OWBPA Imposes Strict Limits on Waivers of Rights and Claims under the ADEA**

27. When Congress amended the ADEA by passing the OWBPA in 1990, it recognized that older workers leaving a job are disproportionately vulnerable to being coerced and manipulated into waiving rights protected by the ADEA without being fully informed of the rights and claims they may be relinquishing. *See Syverson v. IBM*, 461 F.3d at 1151 (citing S. REP. NO. 101-263, at 5 (1990), as reprinted in 1990 U.S.C.C.A.N. 1509, 1510).

28. As Congress found, workers who are at least 40 years old face greater pressure to sign waivers of their rights and claims in part because they are less likely than younger workers to find a new job quickly and are therefore more dependent on the temporary economic relief afforded by a severance payment. S. Rep. 101-79, at 9 (1989).

29. In the OWBPA, Congress sought to combat this problem by strictly requiring employers to provide certain "minimum" information to workers who are laid off as a group before their waiver of any "right or claim" protected by the ADEA would be deemed "knowing and voluntary," and therefore enforceable. 29 U.S.C. § 626(f)(1).

30. As noted in the Senate Committee report for the OWBPA, the problem of coercive and manipulative pressure on older workers to sign agreements waiving their rights under the ADEA is particularly acute in group terminations or when an employer pressures workers to take advantage of an early retirement incentive program. S. Rep. 101-79, at 9.

31. In these situations, individual employees are often uninformed about whether "age may have played a role in the employer's decision," and whether the reduction-in-force or incentive program "may be designed to remove older workers from the labor force." *Id.*

32. In the OWBPA, Congress added enhanced protections for older workers when an employer extracts a waiver of ADEA rights or claims "in connection with an exit incentive or other employment termination program." 29 U.S.C. § 629(f)(1)(H). The Department of Labor has defined "other employment termination program" to mean "when an employer offers additional consideration for the signing of a waiver pursuant to an . . . employment termination (*e.g.* a reduction in force) to two or more employees." 29 C.F.R. § 1625.22(f).

33. In a group termination program, no "right or claim" protected by the ADEA may be waived by an employee unless the employer informs the employees affected by the termination in writing of the (a) "class, unit, or group" that is subject to the group termination, (b) "any eligibility factors" that may affect the workers' selection for termination, (c) "the job titles and ages of all individuals" for whom the employer seeks to extract a waiver and (d) "the ages of all individuals in the same job classification or organizational unit" within the group who were exempt from the lay-off. 29 U.S.C. § 626(f)(1)(H); 29 C.F.R. § 1625.22(f).

34. The OWBPA requires disclosure of this information as a condition of a valid waiver to ensure that workers have the opportunity to assess whether they have an age discrimination claim due to their termination that they may wish to pursue individually or collectively rather than waive. 29 U.S.C. § 626(f)(1)(H)(ii). The text of the OWBPA provides no exception to the disclosure requirement.

**In 2014, IBM Stops Providing the Required Comparator Information**

35. On information and belief, IBM conducted at least a dozen group layoffs between 2001 and the end of 2013. In each of these layoffs, IBM employed a standard Resource Action Separation Agreement, which required employees to sign a general waiver of employment-

8

related rights and claims, including all rights and claims under the ADEA, in order to receive a severance payment and benefits.

36. During that time, IBM consistently provided employees selected for layoff with the OWBPA comparator information.

37. In 2014, however, IBM abruptly made a company-wide change: it stopped providing the OWMPA comparator information to employees it laid off in Resource Actions.

38. At the same time, IBM reformulated its standard Separation Agreement. The Separation Agreements the Plaintiffs received when they were each laid off, attached as Exhibit 1, are representative of the standard Resource Action Separation Agreements used by IBM from 2014 to the present.

39. The Separation Agreement IBM has used since 2014 continued to generally require employees to sign an employment discrimination waiver in order to receive a severance payment, but it carved out a special exception for age discrimination claims under the ADEA.

40. As a condition of receiving the severance payment and benefits provided to laid-off employees, IBM still required the employees to waive their state age discrimination and claims. The special exception reached only the ADEA (and the West Virginia Human Rights Act).

41. Although the Separation Agreement did not require employees to waive all their rights and claims under the ADEA, it did require them to waive their right under the ADEA to pursue their claims collectively in any forum, including in arbitration.

42. In particular, the Agreement provided as follows:

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, YOU AND IBM AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD, OR DETERMINED ON A MULTIPARTY, CLASS ACTION BASIS OR COLLECTIVE ACTION BASIS EITHER IN COURT OR

IN ARBITRATION, AND THAT YOU ARE NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS ACTION MEMBER OR REPRESENTATIVE, OR COLLECTIVE ACTION MEMBER OR REPRESENTATIVE, OR RECEIVE ANY RECOVERY FROM A CLASS OR COLLECTIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR ARBITRATION.

43. The new Agreement also required employees to agree "that if you are included within any class action or collective action in court or in arbitration involving a Covered Claim, you will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be."

44. IBM's intention behind this change was clear. As Doug Shelton, IBM's Director of Corporate Communications & External Relations, admitted to a business reporter in 2014, the change was made to avoid providing the comparator information that the OWBPA required in order to ensure the waiver of any "right or claim" under the ADEA was knowing and voluntary.[1]

**IBM's New Waiver Violates the OWBPA and Is Unenforceable**

45. Under the ADEA as amended by the OWBPA, employees subject to a group termination program "may not waive any right or claim under this chapter" (*i.e.*, Title 29, Chapter 14 of the United States Code, which contains the ADEA) unless the waiver complies with all OWBPA requirements for a valid waiver, including providing the OWBPA comparator information.

46. Unlike the vast majority of federal employment statutes, such as Title VII, the ADA, and the NLRA, the ADEA incorporates two separate but related rights to bring claims collectively, each of which is explicitly defined as a "right."

---

[1] Alex Barinka, "Old, Fired at IBM: Trendsetter Offers Workers Arbitration," *Bloomberg BNA* (May 12, 2014), https://web.archive.org/web/20170225221835/https://www.bloomberg.com/news/articles/2014-05-12/old-fired-at-ibm-trendsetter-offers-workers-arbitration (last visited March 11, 2019).

47. First, the ADEA, at 29 U.S.C. § 626(b), expressly incorporates most of the enforcement provisions of the Fair Labor Standard Act (FLSA), including all of the FLSA provisions in 29 U.S.C. § 216(b). In turn, 29 U.S.C. § 216(b) (emphasis added) of the FLSA explicitly refers to an employee's entitlement to initiate a collective action "for and in behalf of himself . . . and other employees similarly situated" as a "**right provided by this subsection**." Thus, under the ADEA, an employee has the explicit statutory "right" to initiate a collective action "for and in behalf of himself and other employees similarly situated."

48. Second, an employee has the "right" under the ADEA to join a collective action as a "party plaintiff," a statutory term of art meaning individuals who opt in to a collective action. 29 U.S.C. § 216(b) (FLSA provision explicitly referring to an employee's entitlement "to become a party plaintiff to any such action" as a "**right provided by this subsection**") (emphasis added; incorporated directly into the ADEA by 29 U.S.C. § 626(b)).

49. In contrast to the ADEA, which incorporates the explicit statutory right to proceed collectively, the right to proceed collectively under most other civil rights statutes is only provided by external procedural rules, such as Fed. R. Civ. P. 23, that are not specifically provided in the statutory text.

50. Thus, the protections in the OBWPA against waiving "any right or claim" under the ADEA apply to the ADEA's incorporated "right" to initiate a collective action and "right" to join an ADEA collective action.

51. Because IBM did not provide the OWBPA comparator information to employees it terminated through Resource Actions, the waivers extracted by IBM of the right to pursue claims under the ADEA collectively are invalid and unenforceable.

11

**IBM's Invalid Collective Action Waiver is a Crucial Component of its Scheme to Cover up its Discrimination against Older Employees**

52. IBM's company-wide decision in 2014 to stop providing the OWBPA comparator information when conducting group layoffs coincided with its company-wide use of illegal criteria and procedures in those layoffs designed to get rid of older workers to make way for younger workers.

53. At the same time IBM revised its Separation Agreement, it was revamping its hiring and marketing strategies to appeal to a younger, "Millennial" audience.

54. In furtherance of this rebranding initiative, IBM sought to systematically reduce its percentage of older workers in order to make room for a new generation of younger employees. This effort to "correct [the] seniority mix" at the company, as it was described in a presentation to Diane Gherson, IBM's Senior Vice President of Human Resources, and James Kavanaugh, now IBM's Chief Financial Officer, was the culmination of years of study and discussion within the company that stereotyped older workers as rigid and unimaginative while praising "Millennial" employees as innovative.

55. For example, a 2006 IBM's internal report on the demographics of its employees described older workers as "gray hairs" and "old heads." This report, which was conducted by one of the company's consulting departments, concluded that younger workers "are generally much more innovative and receptive to technology than baby boomers," and thus recommended focusing the company's "organizational technology" on those younger workers.[2]

56. In 2014, IBM launched a company-sponsored blog called "The Millennial Experience" and a social media campaign using the Twitter hashtag, #IBMMillennial. It also

---

[2] *See* The Maturing Workforce: Innovation in Workforce Enablement (2006), https://assets.documentcloud.org/documents/4414883/Maturing-Workforce-feus01291-1.pdf (last visited March 22, 2019).

created "Millennial Corps," a network of young employees to be consulted by IBM senior leadership about business decisions.

57.     At about the same time, new IBM Chief Executive Officer Virginia "Ginni" Rometty conducted a major overhaul of the company to focus more on "CAMS," an acronym for Cloud-Analytics-Mobile-Security & Social Media.

58.     A presentation, titled "CAMS are Driven By Millennial Traits," was made at a 2014 IBM event in New York. The slides in that presentation claimed that Millennials typically exhibit desirable work attributes, like placing trust in data and reaching decisions through collaboration and consensus, while individuals over 50 typically exhibit undesirable work attributes, like being "more dubious" of analytics, placing "less stock in data," and being less "motivated to consult their colleagues to get buy in." The IBM slides concluded that "It's Baby Boomers who are the outliers."

59.     In 2015 and 2016, IBM doubled down on its efforts to replace its long-tenured, older employees with the younger Millennials it sought to recruit. IBM made presentations to its senior executives calling for IBM to evaluate its long-term employees more harshly, to use those negative evaluations to justify selecting long-term employees for lay-off, and to replace these employees with "EPs"— IBM management short-hand for "early professionals," also called "early professional hires" or EPHs.[3]

60.     As one news article touting IBM's Millennial-focused approach explained, "[t]he idea" behind IBM "pushing for 'early professional hiring' (EPH)" was "to bring in as much young talent into the workforce with every given opportunity." A Vice President at IBM defined

---

[3] *See* Peter Gosselin & Ariana Tobin, "Cutting 'Old Heads' at IBM," *ProPublica* (Mar. 22, 2018), https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/ (last visited Mar. 22, 2019).

"early professionals" as engineers with "two or three years' experience" or consultants with "one or two years' experience," who would then be "fast forwarded" to high level positions.[4]

61. IBM presentations prepared in 2015 and 2016 for executives in the part of the company where Plaintiff Margaret Ahlders was employed included plans for IBM to adopt an "aggressive performance management posture" and double the share of employees given negative evaluations, to use those negative evaluations to select 3,000 employees for group terminations, and to replace the majority of those laid off with "early professionals."

62. Likewise, an IBM presentation prepared for executives in the part of the company where Plaintiff Cheryl Witmer was employed included plans for "an influx of EPs" to "correct" the company's "seniority mix." This presentation also called for a more "aggressive performance management approach" to facilitate a reduction of 2,500 employees. IBM's Human Resources Vice President Diane Gherson and IBM's current Chief Financial Officer James Kavanaugh attended the presentation.

63. A 2016 IBM presentation prepared for its executives concerning layoffs in the part of the company where Plaintiff Steven Estle was employed specifically called for managers to exempt all "early professional hires" from layoff, regardless of performance. The long-serving, older employees were provided no such exemption.

64. In the past six years alone, IBM has discharged over 20,000 U.S. employees who were at least 40 years old in pursuit of a company-wide practice of using forced group terminations, referred to as "Resource Actions," to accomplish its goal of removing older employees from its labor force.[5]

---

[4] *IBM New Team to Focus on Millennials*, Business Standard, May 31, 2016, https://www.business-standard.com/article/companies/ibm-s-new-team-to-focus-on-millennials-116053000677_1.html (last visited March 22, 2019).
[5] Gosselin & Tobin, "Cutting 'Old Heads' at IBM," *supra* n.3.

### Plaintiffs were Terminated as Part of IBM's Pattern and Practice of Illegal Age Discrimination

65. Plaintiffs, as well as many similarly situated employees, were swept up in IBM's systemic pattern and practice of targeting older workers for elimination from its workforce.

66. Plaintiffs Estle, Ahlders, and Witmer each worked for IBM for over three decades. Plaintiff Salonia worked for IBM more than ten years.

67. Plaintiffs each consistently met or exceeded job expectations, generally receiving high scores on their annual evaluations.

68. After 2014, as IBM followed through on its plans to "correct [its] seniority mix" by adopting an "aggressive performance management posture," IBM downgraded Plaintiffs' annual evaluation scores. Plaintiff Estle received three 2s in a row from 2014 to 2016 for the first time in his career. Plaintiff Ahlders received the first 3 of her career in 2016. Plaintiff Salonia received the first 3s of his career in 2014 and 2015. Plaintiff Witmer received the first 3 of her career in 2016.

69. In March 2016, the Plaintiffs each received notice that they were being terminated as part of a Resource Action, effective May 31, 2016.

70. IBM falsely characterized the termination of all four Plaintiffs as retirements. Plaintiffs Estle, Ahlders, and Salonia were 56 when they were terminated. Plaintiff Witmer was 57.

### IBM Illegally Conditions Severance on Plaintiffs' Agreement to Waive Their "Right" under the ADEA to Proceed Collectively

71. Shortly after the Plaintiffs were notified of their impending terminations, IBM provided each of them with a 33-page document titled "Resource Action Information Package for Employees."

72. This document provided information about a number of incentives available to them if they agreed to sign a "Resource Action Separation Agreement." That Resource Action Separation Agreement, including an attachment titled "Arbitration Procedure and Collective Action Waiver," which was the final six pages of the document, is the Agreement described above at paragraphs 35 through 43 of this Complaint.

73. The incentives offered to employees who signed the Agreement included the following, among others: (a) a lump sum severance payment equivalent to one month of salary; (b) 12 months of continued health insurance and life insurance coverage for employees with 25 years of service, or 6 months for employees with 5 to 25 years of service; (c) free outplacement and career counseling services provided by Right Management, a leading career transition consulting firm; and (d) reimbursement for up to $2,500 for job-related skills training.

74. As the Resource Action Separation Agreement informed them, "[y]ou will receive and be entitled to keep these payments and benefits only if you accept and comply with all terms of this Agreement."

75. To receive a severance payment, critical health insurance, or even basic job-training services after decades at IBM, each of the Plaintiffs had to waive their right under the ADEA to collectively challenge their discriminatory terminations, even in arbitration.

76. IBM failed to provide any of the OWBPA comparator information to Plaintiffs. They received no information in writing regarding which "class, unit, or group" their Resource Action would affect, "any eligibility factors" for the Resource Action, "the job titles and ages of all individuals" asked to sign the waiver, or "the ages of all individuals in the same job classification or organizational unit" within the group who were spared, as the OWBPA requires.

77. Each of the Plaintiffs signed the Separation Agreement.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

78. As recently fired IBM workers began sharing their stories and more information about IBM's discriminatory practices became publicly available, Plaintiffs realized that many other similarly situated older employees had been similarly discriminated against and terminated as part of group layoffs. Plaintiffs then filed charges alleging unlawful age discrimination with the Equal Employment Opportunity Commission (EEOC) challenging their lay off on behalf of themselves and others similarly situated.

79. Plaintiffs' class-based charges were timely filed and have been pending before the EEOC for more than 60 days.

## VI. REQUEST FOR DECLARATORY JUDGMENT

80. Plaintiffs repeat the allegations contained in Paragraphs 1 through 79.

81. Plaintiffs, along with all others similarly situated: (a) were offered a severance payment, but only if they would sign IBM's new standard Separation Agreement purporting to waive their rights under the ADEA to pursue a collective action; (b) were denied the standard OWBPA comparator information; and (c) signed the purported waiver.

82. Each of the Plaintiffs now wishes to proceed with an ADEA collective action, as is their "right" under the ADEA.

83. When a dispute arises "over whether any of the requirements of [the OWBPA] have been met, the party asserting the validity of a waiver shall have the burden of proving in a court of competent jurisdiction that a waiver was knowing and voluntary [as provided in the OWBPA]." 29 U.S.C. § 626(f)(3); *see also Syverson v. IBM*, 461 F3d at 1152.

84. Because IBM's collective action waiver does not meet the requirements in the OWBPA for a waiver of a "right" under the ADEA to be considered "knowing and voluntary,"

and because the "right" to proceed collectively is specifically incorporated in the ADEA, the collective action waiver signed by the Plaintiffs is invalid.

**Wherefore,** Plaintiffs request that the Court grant the following relief against Defendant:

(a) Declare IBM's purported waiver of Plaintiffs' rights to initiate or join a collective action under the ADEA invalid, because the purported waiver violates the OWBPA, 29 U.S.C. § 626(f);

(b) Enter injunctive relief barring IBM from attempting to enforce the purported waiver against Plaintiffs, including its requirement that Plaintiffs take affirmative steps to opt out or refrain from opting in to any class or collective action, in any forum in the United States, including in arbitration;

(c) Enter injunctive relief ordering this matter to arbitration as a collective action;

(d) Award Plaintiffs full costs and reasonable attorney's fees; and

(e) Award such further relief as is deemed appropriate.

Respectfully submitted,

Date: March 27, 2019

/s/ *Michael Eisenkraft*
Michael Eisenkraft
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Email: meisenkraft@cohenmilstein.com

/s/ *Joseph M. Sellers*
Joseph M. Sellers
Shaylyn Cochran
Cohen Milstein Sellers & Toll P.L.L.C.
1100 New York Avenue, N.W. Suite 500
Washington, D.C. 20005

Tel: (202) 408-4600
Email: jsellers@cohenmilstein.com
Email: scochran@cohenmilstein.com

/s/ *Jeffrey Neil Young*
Jeffrey Neil Young
/s/ *David G. Webbert*
David G. Webbert
Carol J. Garvan
Max I. Brooks
Shelby H. Leighton
Johnson, Webbert & Young, LLP
160 Capitol Street, P.O. Box 79
Augusta, Maine 04332
Tel: (207) 623-5110
Email: jyoung@work.law
Email: dwebbert@work.law
Email: cgarvan@work.law
Email: mbrooks@work.law
Email: sleighton@work.law


*Attorneys for Plaintiffs*